**TEXAS DEPARTMENT OF BANKING; Randall S. James, Banking Commissioner; and Carole Keeton Rylander, Texas Comptroller of Public Accounts, Appellants,[1]**

v.

**MOUNT OLIVET CEMETERY ASSOCIATION, Appellee.**

No. 03–99–00359–CV.

Court of Appeals of Texas, Austin.

Aug. 31, 2000.

---

**1.** This appeal was originally filed in the names of the predecessors to the present Banking Commissioner. We have substituted the current holder of that office as the correct party to this proceeding. *See* Tex.R.App. P. 7.2(a).

Maureen Powers, Asst. Atty., Gen., Austin, for Appellants.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, P.C., Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

This appeal arises from a dispute between appellee Mount Olivet Cemetery Association ("Mount Olivet") and appellants the Banking Commissioner (the "Commissioner"), the Texas Department of Banking (the "Department"), and the Comptroller of Public Accounts (the "Comptroller")[2] as to whether certain funds from prepaid funeral contracts escheat to the State by virtue of the abandoned-property laws.[3] The district court ruled in favor of Mount Olivet, declaring that these funds are not subject to escheat under such laws and awarding Mount Olivet attorney's fees. The State appeals, asserting that the district court lacked jurisdiction and that the abandoned-property laws apply to the funds at issue. Because we conclude that the district court had jurisdiction to adjudicate Mount Olivet's claims and that Mount Olivet is not subject to the abandoned-property laws, we will affirm the district court's judgment.

**2.** We will refer to appellants collectively as the "State" unless separate reference is required.

**3.** Two sets of abandoned-property laws are at issue in this appeal. See Tex. Fin.Code Ann. §§ 154.001–.414 (West 1998 & Supp.2000); Tex. Prop.Code Ann. §§ 71.001–75.102 (West 1995 & Supp.2000). We will refer to these laws jointly as "abandoned-property laws."

**4.** In 1997 article 548b was codified in the Finance Code. See Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen.

## FACTUAL & LEGAL BACKGROUND

Mount Olivet markets and sells prepaid funeral benefits to those who wish to arrange and pay for their funerals in advance of needing such services. Pursuant to the Texas Finance Code, the Department regulates the sale of prepaid funeral services and merchandise. See Tex.Rev. Civ. Stat. Ann. art. 548b (repealed 1997 and codified at Tex. Fin.Code Ann. §§ 154.001–.414 (West 1998 & Supp. 2000)).[4] The primary purpose of article 548b is to protect purchasers who have contracted and paid in advance for funeral services. See Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 133 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (Mount Olivet I). When promulgated in 1955, section 5 of article 548b provided the only method for the sale of prepaid funeral services. See Act of May 31, 1955, 54th Leg., R.S., ch. 512, 1955 Tex. Gen. Laws 1292, 1293. In pertinent part, section 5 provided:

> [A]ll funds collected under contracts for prepaid funeral expenses ... shall be placed in a state or national bank, or building and loan association in this State and so deposited not less than thirty (30) days after collection, to be held in a trust fund in this State for the use, benefit and protection of purchasers of such contracts.

*Id.*

In 1963 the legislature amended article 548b by adding section 1a, which provided two additional methods for the sale and protection of prepaid funeral benefits: (1)

Laws 3091, 3385 (Tex.Rev.Civ. Stat. Ann. art 548b, since repealed and codified at Tex. Fin. Code Ann. §§ 154.001–.414 (West 1998 & Supp.2000)). Because the 1997 Act was intended as a codification only, making no substantive change in the law, see id. § 7 at 3603, and all parties refer in their briefs to article 548b, we will cite to the pertinent provisions of former article 548b, unless the context of our discussion requires citation to the Finance Code. We will refer in the text generally to the above law as "article 548b."

a fund created by a "contract of insurance with an insurance company licensed in Texas" or (2) a "fund, investment, debenture, security, or contract . . . approved by the . . . Department as safeguarding the rights and interests of the individual and his heirs and assigns to substantially the same or greater degree as . . . funds regulated by Section 5." Act of May 23, 1963, 58th Leg., R.S., ch. 496, § 2, 1963 Tex. Gen. Laws 1304, 1304. The legislature considered these two additional methods of sale as exceptions to section 5's more general provisions. *See id.*

In 1981 Mount Olivet applied to the Department for approval of a section 1a plan (the "Mount Olivet Plan"). Following an adjudicative hearing before the Commissioner, the Department approved the Mount Olivet Plan under section 1a. *See Mount Olivet I,* 720 S.W.2d at 134. According to the terms of the Mount Olivet Plan, all proceeds from the sale of funeral-benefit contracts are deposited in the Mount Olivet Trust. An independent trustee periodically distributes accrued earnings from the Mount Olivet Trust to Mount Olivet, and Mount Olivet uses these earnings for the provision of funeral and related services and to operate and improve its cemeteries.

In 1991 section 5A, providing that some prepaid funeral benefits were presumed abandoned under certain conditions, was added to article 548b. *See* Act of July 23, 1991, 72d Leg., 1st C.S., ch. 1, § 1, 1991 Tex. Gen. Laws 1, 1-2.

In 1993 the legislature amended section 5A to read as follows: [5]

(a) Money paid by a purchaser of a prepaid funeral benefits contract is personal property subject to presumption of abandonment and delivery to the comp-troller under Title 6, Property Code.[6] This subchapter controls in case of conflict with that title.

(b) Money paid by a purchaser of a prepaid funerals benefits contract and held in the name of the seller at a depository under [Section 5] is presumed abandoned if:

· (1) the amount due the seller . . . has been collected and:

(A) the seller has not known the existence and location of the purchaser or the beneficiary of the contract for the three preceding years;

(B) according to the knowledge and records of the seller, a claim to the money or contract has not been asserted or an act of ownership of the money or contract has not been exercised during the three preceding years;

(C) at least 60 years have elapsed since the date the purchaser executed the contract; and

(D) at least 90 years have elapsed since the date of birth of the beneficiary of the contract; or

(2) the amount due the seller . . . has not been paid and during the three preceding years:

(A) the purchaser has not made a payment . . . ;

(B) the seller has not known the existence and location of the purchaser or the beneficiary of the contract; and

(C) according to the knowledge and records of the seller, a claim to the money or contract has not been asserted and an act of ownership of the money or contract has not been exercised.

---

5. *See* Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 1, 1993 Tex. Gen. Laws 3211, 3223–24. At the same time, the legislature renumbered article 548b and section 5A became section 5B; for convenience, we will continue to refer to this section as section 5A, as did the parties in their briefs.

6. The Property Code generally provides that if an owner of personal property does not perform an act of ownership within three years, the property is presumed abandoned and should escheat to the State. *See* Tex. Prop. Code Ann. § 72.101 (West 1995); *Melton v. State,* 993 S.W.2d 95, 102 (Tex.1999).

Tex. Fin.Code Ann. § 154.301 (West 1998) (footnote added).[7] In the 1993 Act, the legislature included a grandfather clause:

A fund, investment, security, or contract included in a plan approved before the effective date of this Act by the Banking Department of Texas *under section 1a* ... may continue in effect. Any funds pursuant to such a plan under a contract entered into before, on, or after the effective date of this Act shall continue to be handled in accordance with that approved plan. . . .

Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 4, 1993 Tex. Gen. Laws 3211, 3228 (emphasis added).

In 1995 disputes between Mount Olivet and the State began over whether the funds held under the Mount Olivet Plan were subject to escheat. Mount Olivet argued they were not, but the State asserted that certain funds held by Mount Olivet were abandoned property and must be delivered to the Comptroller under the abandoned-property laws. According to Mount Olivet, a Department auditor stated in a 1995 audit report that certain of Mount Olivet's funds appear to be abandoned property that should escheat to the State. As suggested by the Department, Mount Olivet met and corresponded with the State to explain its position. Neither party took any further action in 1995. In 1996 the auditor repeated the earlier notation in a later audit report. Mount Olivet further corresponded with the State, but again no action was taken. In 1997 a Department auditor's report stated that Mount Olivet had violated article 548b by failing to remit certain funds and that these funds should escheat to the State immediately. The Department again invited Mount Olivet to explain why the funds should not escheat and Mount Olivet re-

sponded with a seven-page letter. In February 1998 the Department notified Mount Olivet that it did not agree with Mount Olivet's analysis. After further attempts at negotiation failed, the Department notified Mount Olivet in May 1998 that Mount Olivet's failure to escheat the funds violated state law and that the Department would refer this violation to the Comptroller for possible enforcement.

Mount Olivet brought this action to resolve the statutory-construction dispute. Specifically, Mount Olivet asked for a temporary and permanent injunction prohibiting the State from "taking any action impairing the [Mount Olivet] Plan or requiring delivery of allegedly abandoned property to the Comptroller, or from initiating any administrative, civil or criminal penalty or enforcement proceedings against [Mount Olivet]." Under the Uniform Declaratory Judgments Act ("Declaratory Judgments Act"),[8] Mount Olivet asked the court to declare that Mount Olivet is not required to deliver the funds at issue to the Comptroller and that the Department's rules regarding abandoned property[9] do not apply to Mount Olivet. Mount Olivet also asked for attorney's fees. The State filed a plea to the jurisdiction, which the court denied. The State then counterclaimed for the delivery of the unclaimed funds held by Mount Olivet.

The parties filed competing motions for partial summary judgment on the issue of whether the funds held by Mount Olivet should escheat to the State. In its motion, Mount Olivet asked the district court to declare that Mount Olivet is not subject to the abandoned-property laws set forth in article 548b or in title six of the Property

7. There were no amendments to section 5A between the 1993 amendment and the codification in 1997. For convenience, we quote the Finance Code here.

8. Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997 & Supp.2000).

9. Mount Olivet specifically complains about sections 25.11(b)(11) and 25.12(g) of title seven of the Texas Administrative Code. *See* 7 Tex. Admin. Code §§ 25.11(b)(11), 25.17(g) (1999).

Code [10] and that Mount Olivet is not subject to the Department's administrative rules applicable to abandoned property. After a hearing, the district court granted Mount Olivet's motion and denied the State's motion. Mount Olivet then filed a motion seeking an award of a stipulated amount of attorney's fees pursuant to the Declaratory Judgments Act. The district court awarded Mount Olivet attorney's fees and incorporated that award in a final judgment, which also included the order granting Mount Olivet's motion for partial summary judgment. The State complains on appeal that: (1) Mount Olivet is subject to the abandoned-property laws and therefore must escheat the abandoned funds to the State [11] and (2) Mount Olivet did not plead facts sufficient to confer jurisdiction on the district court for either the declaratory or the injunctive relief sought. We will initially address the State's second issue.

## DISCUSSION

### I. *Jurisdiction*

The State argues in its second issue that "[Mount Olivet]'s petition failed to allege any facts that would confer jurisdiction on the trial court." Specifically, the State claims that Mount Olivet lacked standing to file a declaratory-judgment action and suit for injunction against the State in the sense that (1) Mount Olivet did not allege a waiver of sovereign immunity, (2) Mount Olivet's claim was not ripe for adjudication, and (3) a declaratory-judgment action pursuant to the Administrative Procedure Act is "inappropriate." The State also argues that (1) Mount Olivet's pleadings did not support injunctive relief and (2) Mount Olivet pleaded no facts to support its allegations of constitutional deprivation.

Whether the district court properly denied the State's plea to the jurisdiction presents a pure question of law that we will review *de novo*. *See State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 735 (Tex.App.—Fort Worth 1996, writ denied).

### A. *Sovereign Immunity*

Generally, sovereign immunity, unless waived, protects the State, its agencies, and its officials from lawsuits for damages, absent legislative consent to sue the State. *See Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 405 (Tex.1997). However, a "party can maintain a suit to determine its rights without legislative permission." *Id.* (citing *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (Tex.1945)). Here, Mount Olivet brought a declaratory-judgment action to determine its rights under certain abandoned-property laws, and its pleadings reflected such.[12] The supreme court has interpreted the Declaratory Judgments Act as a waiver of sovereign immunity from suits brought to construe statutes. *See City of LaPorte v. Barfield*, 898 S.W.2d 288, 297 (Tex.1995); *Star Houston, Inc. v. Texas Dep't of Transp.*, 957 S.W.2d 102, 111 (Tex. App.—Austin 1997, pet. denied). We hold that sovereign immunity does not bar Mount Olivet's suit for declaratory relief.

### B. *Ripeness*

The State also argues that Mount Olivet lacked standing because there was no justiciable controversy ripe for adjudication. Before a court may address the merits of any case, the court must have jurisdiction over the party or the property subject to the suit and over the subject matter, jurisdiction to enter the particular judgment, and capacity to

---

10. Tex. Prop.Code Ann. §§ 71.001–75.102. We will refer to these statutes as "title six of the Property Code."

11. It is unclear from the State's brief whether it is arguing that Mount Olivet is subject to the abandoned-property laws in article 548b. Construing the State's argument broadly, we

will address this issue. *See* Tex.R.App. P. 38.1, .9.

12. We do not consider Mount Olivet's request for injunction because the district-court judgment awarded only declaratory relief, not injunctive relief.

act as a court. *See Austin I.S.D. v. Sierra Club*, 495 S.W.2d 878, 881 (Tex.1973). Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443–46 (Tex. 1993). If the district court lacks jurisdiction, in any of these senses, then its decision would not bind the parties. *See Sierra Club*, 495 S.W.2d at 881 (noting that collateral attacks on judgment are allowed when district court lacked jurisdiction). A decision that does not bind the parties is, by definition, an advisory opinion prohibited by Texas law. *See Texas Ass'n of Bus.*, 852 S.W.2d at 444 (citing Tex. Const. art. II, § 1, as prohibiting advisory opinions).

■■■ Ripeness is an element of subject-matter jurisdiction meant to conserve "judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998). Ripeness examines when an action may be brought. *See Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex.1998). In order for a party to present a justiciable controversy, facts must be sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. *See id.* "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* at 443. Under the Declaratory Judgments Act,

> [i]t is not necessary that a person who seeks a declaration of rights ... shall have incurred ... damage or injury ... but it has frequently been held that an action for declaratory judgment would lie when the fact situation manifests the presence of "ripening seeds of a controversy." Such *appear* where the *claims* of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy.

*Texas Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153–54 (Tex.App.—Austin 1998, no pet.) (quoting *Ainsworth v. Oil City Brass Works*, 271 S.W.2d 754, 761 (Tex.Civ.App.—Beaumont 1954, no writ)).

■■■ The dispute between Mount Olivet and the State began in 1995, when the Department stated in its annual audit of Mount Olivet that certain funds appeared to be abandoned property that should be escheated to the State. The statement was repeated in later audits, and in 1997 the auditor's report stated that Mount Olivet had violated article 548b by failing to remit to the State the funds that were in question. The Department also sent Mount Olivet a letter stating that its failure to escheat the funds violated state law. This notice of statutory violation subjected Mount Olivet to possible civil and criminal penalties. *See* Tex. Fin.Code Ann. §§ 154.406 (civil penalties), 154.402 (criminal penalties) (West 1998). By May 1998 the Department had cited Mount Olivet for violation of a statute, had refused to negotiate any short-term settlement of Mount Olivet's remitting the funds, and had referred the matter to the Comptroller for enforcement action.

■■■ The State argues that because Mount Olivet had suffered no actual injury and because there was no agency order in place affecting Mount Olivet's rights, the controversy was not ripe. However, ripeness does not require an *actual injury;* Mount Olivet is only required to show that an injury *is likely to occur. See Patterson*, 971 S.W.2d at 442. Also, there is no requirement that an agency undertake an enforcement action before the potential subject of that action can file suit for declaratory judgment.[13] *See Moore*, 985

---

**13.** The State argues that *Edgewood I.S.D. v. Meno*, 917 S.W.2d 717, 741 (Tex.1995), requires that "there must be an *existing* commissioner's order pursuant to the challenged

S.W.2d at 153–54 (in declaratory-judgment context, ripeness only requires "ripening seeds of a controversy"). We are not persuaded by the State's arguments. We hold that, under the facts of this case, a ripe, justiciable controversy exists, not an abstract or hypothetical dispute.

### C. *Additional Jurisdictional Arguments*

The State argues that "[Mount Olivet] may not seek a declaratory review of the Finance Code through the back door by alleging some infirmity of the rules promulgated by the Commissioner in support of the administration of the code." Mount Olivet alleged in its pleadings that the district court also had jurisdiction to hear its claims under section 2001.038 of the Government Code, which authorizes the filing of a declaratory-judgment action to determine the validity of any rule adopted by an administrative agency. *See* Tex. Gov't Code Ann. § 2001.038 (West 2000). Because we have determined that the district court had jurisdiction under the Declaratory Judgments Act, we do not address this argument. *See* Tex.R.App. P. 47.1. It is unnecessary to determine if Mount Olivet properly invoked the Government Code to confer jurisdiction over Mount Olivet's complaint about the administrative rules because the State does not complain about Mount Olivet's use of the Government Code in that manner.

The State also argues that there were no pleadings to support injunctive relief. However, Mount Olivet did not seek an injunction in its motion for partial summary judgment, and the district court did not award Mount Olivet injunctive relief. It is therefore unnecessary to consider the State's point. *See id.* The State also asserts that Mount Olivet pleaded no facts to support its allegation of a constitutional deprivation. Because Mount Olivet did not allege that any statute or rule was

unconstitutional or that there has been a taking, we will not address the State's argument. *See id.*

Having disposed of all of the State's jurisdictional arguments, we hold that the district court had jurisdiction over Mount Olivet's claims and overrule the State's second issue.

### II. *Abandoned Property*

■■■ The district court ruled that Mount Olivet was not subject to either the abandoned-property laws in article 548b or title six of the Property Code.[14] Construing the State's first issue broadly, *see supra* note 11, we understand the State to challenge both of these declarations.

■■■■ Statutory construction is a question of law. *See Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex. 1989). Our objective when we construe a statute is to determine and give effect to the legislature's intent. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998); *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex.1994). "To ascertain legislative intent, we must look to the statute as a whole and not to its isolated provisions." *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985). As the State points out, the goal of the court is to "ascertain the consistent purpose of all legislative enactments and to carry out the legislative intent by giving effect to all laws bearing on the same subject." *International Ins. Agency, Inc. v. Railroad Comm'n,* 893 S.W.2d 204, 209 (Tex.App.—Austin 1995, writ denied). This is true even if the laws were enacted by different sessions of the legislature. *See id.*

Mount Olivet is a section 1a seller. The State neither clearly concedes nor disputes Mount Olivet's status as a section 1a seller; however, this Court has previously con-

---

statute in order for the parties to have standing to attack." *Edgewood I.S.D.* is not as broad as the State contends.

14. The State does not attack that portion of the judgment declaring that "[Mount Olivet] is not subject to the requirements set forth in 7 Texas Administrative Code §§ 25.11(b)(11) and 25.12(g)."

firmed that the Mount Olivet Plan was within section 1a. *See Mount Olivet I,* 720 S.W.2d at 134 (stating that after adjudicative hearing before Commissioner, Department issued order that approved Mount Olivet Plan under section 1a). Because Mount Olivet falls within section 1a, it is not a seller under section 5, nor is it subject to its guidelines. As articulated by this Court in *Mount Olivet I,* section 5 "may be avoided by a seller ... [and] compliance with Section 5 is excused, if the seller's contracts are based upon a plan whereby the necessary funds are supplied from a fund, investment, security, or contract ... approved by the Department as safeguarding the right and interests of the [purchasers] to substantially the same or greater degree as ... Section 5." *Mount Olivet I,* 720 S.W.2d at 134.

### A. Whether Mount Olivet is Subject to Section 5A

Having established that Mount Olivet is a section 1a seller, we turn our attention next to section 5A and whether its provisions apply to Mount Olivet. In subsection (b), section 5A states: "Funds paid by a purchaser of a prepaid funeral benefits contract ... under *Section 5* are presumed abandoned if...." Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 1, 1993 Tex. Gen. Laws 3211, 3223 (emphasis added).[15] It is clear from the statute itself that subsection (b) of section 5A expressly applies to section 5 plans and not to section 1a plans. Thus, as a section 1a seller, Mount Olivet is not subject to any of the provisions in subsection (b) of section 5A.

### B. Whether Mount Olivet Is Subject to Title Six of the Property Code

The State argues that under subsection (a) of section 5A, Mount Olivet is subject to title six of the Property Code. Subsection (a) states, "Funds paid by a purchaser of a prepaid funeral benefits contract are personal property subject to presumption of abandonment and delivery to the [Comptroller] under Title 6, Property Code. In the event of a conflict between the provisions of that title and this section, this section controls." *Id.*

■ The Property Code declares personal property abandoned if, for longer than three years: (1) the existence and location of the owner of the property is unknown to the holder of the property; and (2) according to the knowledge and records of the holder of the property, a claim to the property has not been asserted or an act of ownership of the property has not been exercised. *See* Tex. Prop. Code Ann. § 72.101(a) (West 1995). Once property is presumed abandoned, the Comptroller assumes responsibility for it and essentially steps into the shoes of the absent owner. *See Melton v. State,* 993 S.W.2d 95, 102 (Tex.1999). The purpose of removing abandoned property from the possession of the holder is to relieve that holder of any further liability with regard to such property and place it in the hands of the State, thereby providing a means for the absent owner to reclaim the abandoned property. *See* Tex. Prop.Code Ann. § 74.304 (West Supp.1998); *State v. Texas Elec. Serv. Co.,* 488 S.W.2d 878, 881–82 (Tex.Civ.App.—Fort Worth 1972, no writ), *overruled on other grounds sub. nom. State v. Liquidating Trustees of Republic Petroleum Co.,* 510 S.W.2d 311 (Tex.1974). The State contends that since Mount Olivet is subject to subsection (a) of section 5A and certain Mount Olivet funds fall within the category of abandoned property, such funds escheat to the State. Under the State's construction of article 548b, subsection (a) clarified that title six of Property Code applies to *all* sellers of prepaid funerals; then, in subsection (b), article 548b carves out a special exception for section 5 plans. The State asserts that the Property Code applied to Mount Olivet even *before* the 1991 amendment, which first introduced subsection (a). According

---

**15.** In their briefs, both parties frame their arguments around the 1991 amendment, which first passed section 5A. The amendment that is most relevant to this case, however, is the 1993 amendment, which was the last change to section 5A before codification.

to the State, the 1991 amendment (and subsequent 1993 amendment) only made the law more specific with regard to section 5 plans and did not in any way repeal the existing law under the Property Code to which Mount Olivet was already subject.

Both parties rely on *American Surety Co. v. Axtell Co.*, 120 Tex. 166, 36 S.W.2d 715, 718 (Tex.1931), to instruct the Court on the proper interpretation of article 548b:

> To arrive at the intention of the Legislature, ... it is the duty ... to look primarily to the act itself as an entirety; and to understand the legal effect of the amendment enacted by the Legislature, it must be considered in connection with the original act, and that which has been done thereunder. A particular section of an act of the Legislature, when enacted, must be construed in view of the existence of the original statute as it stands after the amendment is introduced; it and all sections of the old law must be regarded as a harmonious whole, as connected with and naturally acting upon each other.... It will be presumed that the Legislature, in adopting the amendment, intended to make some change in the existing law, and therefore the courts will endeavor to give some effect to the amendment.

36 S.W.2d at 718 (internal citations and quotations omitted).

This Court is thus bound to conclude that the legislature, in amending article 548b, intended to change existing law. The State argues that the only change the legislature intended was to provide more specific regulation for section 5 plans. Mount Olivet argues that in enacting *subsection (a)* (which provides that prepaid funerals are subject to the Property Code) along with subsection (b) (which regulates Section 5 plans), the legislature changed prior law, which did *not* subject prepaid funerals to the Property Code, and subjected prepaid funerals to the Property Code for the first time. We agree with Mount Olivet. The only way to give effect

to subsection (a) is to conclude that prepaid funerals were not subject to title six of the Property Code before the legislature passed subsection (a). If this court were to conclude otherwise, section (a) would have no effect, and we must "give some effect to the amendment." *Id.*

Legislative history confirms the Court's interpretation. Both the bill analyses prepared by the Senate Committee on Appropriations and the House Research Organization recognized that before the 1991 amendment, prepaid-funeral funds were not abandoned property subject to the Property Code; a particular law was needed in order that the State reap the benefits of holding abandoned funeral contracts. *See* Senate Comm. on Appropriations, Bill Analysis, Tex. S.B. 9, 72d Leg., 1st C.S. (1991); House Research Org., Bill Analysis of S.B. 9, 72d Leg., 1st C.S. (July 22, 1991).

Having determined that prepaid funeral contracts were not subject to title six of the Property Code prior to the 1991 amendment to article 548b, we must next decide if the amendment itself subjected section 1a plans to the Property Code. Subsection (a) states that prepaid funeral contracts are personal property subject to presumption of abandonment and delivery to the Comptroller under title 6 of the Property Code. The State's position is that subsection (a) merely restates existing law that all prepaid funerals are subject to the Property Code.

In the 1993 amendment, the legislature included all the amended portions of article 548b in section one. Then, in an entirely separate section, it exempted section 1a plans:

> A fund investment, security, or contract included in a plan approved ... by the [Department] under Section 1a ... may continue in effect. Any funds paid pursuant to such a plan ... shall continue to be handled in accordance with that approved plan.

Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 4(a), 1993 Tex. Gen. Laws 3211,

3228. We believe that based on its clear language and location in the Act, section 4 exempted section 1a plans from the entire 1993 Act.[16] The State has no argument to the contrary.

▮ We are further persuaded that section 1a plans are exempt from the entire 1993 amendment because it would lead to absurd results if they were not. Courts should not read a statute to create an absurd result. *See Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex.1996). If section 1a plans were subject to the Property Code, section 5 plans would receive the benefit of section 5A, mandating that between sixty and ninety years must pass before the funds could escheat to the State, but section 1a plans would have to escheat the funds in three years. Thus, if the purchaser of the prepaid funeral has fully paid the contract and has not contacted Mount Olivet in the last three years to assert ownership over the prepaid funeral, the funds from the contract would escheat to the State. This would be an absurd result in two ways. First, a plan that had been specially approved by the Department as providing the same or greater protection as a section 5 plan would be subject to much harsher abandonment laws. We believe that the legislature intended no such distinction between section 5 and section 1a plans. Second, the legislature carefully crafted subsection (b) of section 5A to protect the expectations of purchasers by extending the abandonment period to sixty years after the purchase date of the prepaid funeral, and ninety years after the birth date of the individual who is to receive the prepaid funeral. We think it clear that the legislature did not intend section 1a plans to be subject to escheat in just three years. We further observe that it is likely that once a person prepays a funeral the person's family would not contact Mount Olivet until the payee's death, which could often be more than three years from the last contract payment. In fact, the family might not even know of the prepayment arrangement until the decedent's personal papers were examined *post mortem.*

Moreover, the legislature has previously exempted section 1a plans from provisions within article 548b. *See* Act of May 28, 1987, 70th Leg., R.S., ch. 747, § 2, 1987 Tex. Gen. Laws 2677, 2681 (exempting Mount Olivet from participation in guaranty fund). Both the 1987 and 1993 grandfather clauses demonstrate that the legislature intended section 1a plans to continue to be handled in accordance with the terms of the plan and not be subject to any further regulation.

After examining the statute and its relevant provisions and taking into account its purpose of protecting purchasers, we hold that Mount Olivet is not subject to title six of the Property Code. Instead, Mount Olivet is governed by its approved plan.[17] We overrule the State's first issue.

## CONCLUSION

Having overruled both of the State's issues, we affirm the district-court judgment.[18]

---

**16.** Section 4 of the 1993 Act was not included in the 1997 codification of article 548b. Because the codification was not intended to make substantive changes, we will rely, in this particular case, on the wording of the statute before the codification.

**17.** The parties join issue over whether the Mount Olivet Trust is a holder under the Property Code. *See* Tex. Prop.Code Ann.

§ 72.001(e) (West 1995). Because we have determined that Mount Olivet is not subject to title six of the Property Code, we do not reach this issue. *See* Tex.R.App. P. 47.1.

**18.** The State in its brief generally discusses what it perceives to be the "pernicious effects" of the district-court judgment. Any such "effects" arise by virtue of applying the law to the facts of this case, as we have done

in our examination of the State's issues. We    will not address this argument separately.