TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00217-CV






City of Waco, Appellant



v.



Texas Natural Resource Conservation Commission; and Jeffrey A. Saitas,

as Executive Director, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT


NO. GN1-00654, HONORABLE PAUL DAVIS, JUDGE PRESIDING







 This appeal concerns whether a dispute about the Texas Natural Resource
Conservation Commission's (the TNRCC's) permit-issuing process is ripe for judicial review by the
district court. The Bosque River, a tributary of the Brazos River, is located northwest of the city of
Waco. Segments 1226 and 1255 of the North Bosque River have been listed as having impaired
water quality due to high levels of nutrients. See 30 Tex. Admin. Code §§ 307.1-.10 (2001) (Tex.
Natural Res. Conservation Comm'n, Tex. Surface Water Quality Standards). Near its point of
confluence with the Brazos River, the Bosque River forms Lake Waco, which provides the sole
source of drinking water for approximately 150,000 people in and around Waco; the lake is also used
extensively for recreational activities. The water quality of Lake Waco, which is a "sink" for any
dissolved pollutants in the Bosque River, has been adversely affected. Numerous dairy operations
are located northwest of Waco in Erath County in the Bosque River watershed. The dairies must
seek confined animal feeding operation (CAFO) permits from the TNRCC because the agricultural
waste from their operations, which becomes dissolved in runoff or is otherwise discharged,
ultimately discharges into the river.

 This dispute arose when the TNRCC promulgated an order in February 2000
regulating future permits for CAFOs. Both the City of Waco (the City) and the Texas Association
of Dairymen (the Dairymen) filed actions for declaratory judgments attacking the order. The
TNRCC responded by withdrawing the order and moving to dismiss both actions as moot and not
ripe. The City amended its petition to seek declaratory relief that the TNRCC's interim policy of
continuing to issue any permits violates state regulations. The district court dismissed the actions. 
Both the Dairymen and the City appealed the dismissal of their suits for declaratory relief. However,
following oral argument, the Dairymen voluntarily dismissed their appeal. (1) The only remaining issue
before us is the ripeness of the City's suit for declaratory relief. (2)
 

 Specifically, the City seeks a declaration that the TNRCC may not grant any
additional permits for CAFOs in the Bosque River watershed until it complies with certain federal
regulations that have been incorporated into state law. See 30 Tex. Admin. Code § 305.538 (1999)
(Tex. Natural Res. Conservation Comm'n, Prohibitions for TPDES Permits) ("no permit may be
issued under the conditions prohibited in 40 Code of Federal Regulations § 122.4, as amended"). 
The City maintains that it seeks resolution of a pure question of law: whether section 122.4(i)
operates to bar all new permits until the TNRCC has developed an implementation scheme to reduce
pollution in the two impaired segments of the Bosque River. The TNRCC contends that its
compliance with the regulations can only be determined in the context of a permit application on the
facts presented by a particular application. Because we agree with the City that its request for
declaratory relief presents a determination of law, we reverse the district court's order of dismissal
and remand this cause for consideration on the merits. 


FACTUAL AND PROCEDURAL BACKGROUND

 During the 1980s, the dairy industry expanded greatly in the North Bosque River
watershed. Erath County became the leading county in the state for milk production. This reflects
a trend in the dairy industry away from small, geographically scattered dairies toward large-scale,
clustered dairy operations. In early 2001, the TNRCC estimated that there were 41,000 milk cows
concentrated along the Bosque River watershed. The waste produced by these concentrated
operations has impaired the water quality of the adjacent stretches of the North Bosque River. The
TNRCC has identified the primary source of the pollution to be phosphorus, which is a nutrient
found in animal waste. The large amounts of phosphorus in the water have caused excessive growth
of algae and other aquatic plants, which in turn potentially cause distaste and odor in drinking water
and, under certain circumstances, contribute to the depletion of dissolved oxygen.

 Under the federal Clean Water Act, a state is required to "identify those waters within
its boundaries for which the effluent limitations required by [the Act] are not stringent enough to
implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A) (2001). 
In 1998, the TNRCC listed two segments of the Bosque River as "impaired under narrative water
quality standards related to nutrients and aquatic plant growth." Once the TNRCC identified the
water segments as impaired, it was required to develop a Total Maximum Daily Load (TMDL),
which is a plan for assimilation of the pollutants that are present in the water. See id.
§ 1313(d)(1)(C). (3) The TNRCC describes a TMDL as


a quantitative plan that determines the amount of a particular pollutant that a water
body can receive and still meet its applicable water quality standards. In other words,
TMDLs are the best possible estimates of the assimilative capacity of the water body
for a pollutant under consideration. A TMDL is commonly expressed as a load, with
units of mass per time period, but may be expressed in other ways also. TMDLs
must also estimate how much the pollutant load needs to be reduced from current
levels in order to achieve water quality standards.



More than three years after the TNRCC identified the watershed as impaired, the TNRCC had still
not established a TMDL plan. Although the agency "anticipated" in late 1999 that it would be able
to submit a proposed TMDL to the Environmental Protection Agency (EPA) by the spring of 2000,
the TNRCC did not complete a TMDL until early 2001. The TNRCC has now sent a TMDL to the
EPA for approval; at the time the parties submitted their briefs in this cause, however, the TMDL
had not been approved by that agency.

 The TMDL confirms that a major controllable source of the phosphorus in the water
comes from the dairy farms concentrated in the watershed. It recommends that forty to sixty percent
reductions in phosphorus loadings in some areas and fifty percent overall will be needed to reduce
the potential for problematic algae growth. The City notes various problems with the proposed
TMDL. The City argues that its recommendations are based on now outdated information; the
number of permits currently pending with the TNRCC, if approved, would increase the number of
authorized cows by 20,000, so the previously recommended levels of the TMDL will not achieve
attainment of water quality standards. (4) In addition, the TMDL does not establish the amount of
phosphorus loadings, allocated among the dairies and other dischargers, that could be tolerated
without violating water quality standards for pathogens and nutrients. Nor does it implement
compliance schedules for the dairies and other dischargers to reduce the pathogens in the two
impaired water segments.

 Compounding these failures with respect to existing dischargers, the City asserts that
the TNRCC has worsened the situation by approving new applications for additional discharges of
waste into the already polluted river. With the exception of certain small operations, the dairies in
the watershed are required to obtain CAFO permits from the TNRCC that allow them to discharge
waste from their operations. The City asserts that since declaring the segments impaired, the
TNRCC has continued to grant permits for new and expanded uses under an evolving "interim
policy." Although this interim policy has taken slightly different forms in recent years, the City
asserts that every phase of the policy grants the agency the discretion to issue new permits, contrary
to the regulations prohibiting additional CAFOs until the TNRCC implements measures that will
improve the water quality to meet state standards.

 The Executive Director of the TNRCC testified that the agency will exercise its
discretion to grant new permits as long as the additional discharge will not worsen the
"environmental status quo" of the impaired river. The agency also points to a rule that it says
embodies this policy. See 30 Tex. Admin. Code § 321.33 (2001) (Tex. Natural Res. Conservation
Comm'n, Confined Animal Feeding Operations, Applicability). (5) The City argues that the TNRCC's
current discretionary policy is at odds with state law which requires that a sufficient allocation be
available for the water to receive the additional loading and still meet state water quality standards. 
See id. § 305.538 (1999) (prohibiting permit that would violate 40 C.F.R. § 122.4). The City sought
a declaration that 


until the TNRCC promulgates legally binding regulations to implement TMDLs for
nutrients and pathogens in the two Bosque Segments that contain load allocations and
other measures that will assure compliance with the state water quality standards, no
permit may be issued to construct or operate a new CAFO . . . within the watershed.



The TNRCC argues that the City's suit would not be ripe until the TNRCC issued a specific permit. 
The district court agreed with TNRCC and dismissed the suit. The City now appeals from that
judgment.


DISCUSSION

 Ripeness implicates subject-matter jurisdiction and emphasizes the requirement of
a concrete injury in order to present a justiciable claim. Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d
849, 851 (Tex. 2000); Patterson v. Planned Parenthood, 971 S.W.2d 439, 442 (Tex. 1998). 
Ripeness is concerned with when an action can be brought and seeks to conserve judicial time and
resources for real and current controversies rather than hypothetical or remote disputes. Gibson, 22
S.W.3d at 851; Patterson, 971 S.W.2d at 442-43. Courts of this state may not issue advisory
opinions. Patterson, 971 S.W.2d at 443; Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d
440, 444 (Tex. 1993). An opinion issued in a case that is not ripe would address only a hypothetical
injury rather than remedying actual or imminent harm. See Texas Ass'n of Bus., 852 S.W.2d at 444.

 In determining whether a cause is ripe for judicial consideration, we look to see
whether the facts have sufficiently developed to show that an injury has occurred, or is likely to
occur. Patterson, 971 S.W.2d at 442. A claimant is not required to show that the injury has already
occurred, provided the injury is imminent or sufficiently likely. Gibson, 22 S.W.3d at 852;
Patterson, 971 S.W.2d at 442. Likewise, a person seeking a declaratory judgment need not have
incurred actual injury; a declaratory judgment action will lie if the facts show the presence of
"ripening seeds of a controversy." Texas Dep't of Banking v. Mount Olivet Cemetery Ass'n, 27
S.W.3d 276, 282 (Tex. App.--Austin 2000, pet. denied) (quoting Texas Dep't of Pub. Safety v.
Moore, 985 S.W.2d 149, 153-54 (Tex. App.--Austin 1998, no pet.)). 

 The City contends that its claim that section 122.4(i) of the Code of Federal
Regulations, which has been incorporated into state law, prohibits the TNRCC from issuing permits
for new (6) CAFOs in the watershed until the TNRCC develops compliance schedules and pollutant
load allocations is ripe. Section 122.4(i) reads:


No permit may be issued [t]o a new source or a new discharger, if the discharge from
its construction or operation will cause or contribute to the violation of water quality
standards. The owner or operator of a new source or new discharger proposing to
discharge into a water segment which does not meet applicable water quality
standards or is not expected to meet those standards even after the application of the
effluent limitations required by sections 301(b)(1)(A) and 301(b)(1)(B) of CWA, and
for which the State or interstate agency has performed a pollutants load allocation
for the pollutant to be discharged, must demonstrate, before the close of the public
comment period, that:



 There are sufficient remaining pollutant load allocations to allow for the
discharge; and
 The existing dischargers into that segment are subject to compliance schedules
designed to bring the segment into compliance with applicable water quality
standards. The Director may waive the submission of information by the new
source or new discharger required by paragraph (i) of this section if the Director
determines that the Director already has adequate information to evaluate the
request. An explanation of the development of limitations to meet the criteria
of this paragraph (i)(2) is to be included in the fact sheet to the permit under
§ 124.56(b)(1) of this chapter.




40 C.F.R. § 122.4(i) (2001) (Envtl. Prot. Agency, Nat'l Pollutant Discharge Elimination Sys.,
Prohibitions) (emphasis added). The City interprets section 122.4(i) to mean that "no discharge
permit may be issued to a new CAFO within the impaired watershed until the TNRCC promulgates
regulations to implement TMDLs for phosphorous and pathogens in the two Bosque Segments that
contain load allocations and compliance schedules."

 Under the TNRCC's interpretation, section 122.4(i) does not obligate the agency to
develop load allocations and compliance schedules before it issues a new discharge permit; rather,
it merely limits the TNRCC's ability to issue permits that would "cause or contribute to the violation
of water quality standards." Whether a new permit will cause or contribute to the violation of water
quality standards, the agency continues, depends on the specific conditions and terms of a given
permit. The TNRCC argues that the City's claim does not present a pure question of law because
the agency's compliance with section 122.4(i) can only be determined in the context of an
application for a permit. Thus, according to the TNRCC, the City's claim is not ripe until the agency
approves a permit, because only at that point can one determine whether the permit will cause or
contribute to a violation of water standards. The agency also emphasizes that variations between
state and federal law affect whether a particular permit violates section 122.4(i).

 The City responds that the particular conditions of any permit are irrelevant because
under the agency's rules and policy, every new permit to discharge into impaired waters violates
section 122.4(i). The City points to the rules governing CAFOs, (7) which specifically authorize
discharges in "chronic or catastrophic rainfall events." See 30 Tex. Admin. Code §§ 321.31(b),
.32(8), .34, .39(f)(19)(E) (2001) (Tex. Natural Res. Conservation Comm'n, Concentrated Animal
Feeding Operations). The City also maintains that the TNRCC's own evidence indicates that only
about half of the waste produced by CAFOs is ever "collectible." Even if all of the "collectible
waste" is prevented from entering the watershed, other uncollectible waste is not. Therefore, issuing
an additional permit without pollutant load allocations and compliance schedules will violate section
122.4(i), regardless of the conditions that are imposed. Furthermore, according to the City,
differences between state and federal law are not relevant to its declaratory judgment suit, which is
premised solely on the basis of state law. The City notes that section 122.4(i) has been incorporated
into and become part of state law, and that its claim is based on the TNRCC's failure to implement
standards to comply with state, not federal, water quality standards. 

 We conclude that the question of whether section 122.4(i) operates to prohibit the
TNRCC from approving any new discharge permits until it adopts the necessary pollution-reduction
measures presents a purely legal inquiry. In determining ripeness, courts should examine (1) the
fitness of the issues for judicial decision, and (2) the hardship occasioned to a party by the court's
denying judicial review. Office of Pub. Util. Counsel v. Public Util. Comm'n, 843 S.W.2d 718, 724
(Tex. App.--Austin 1992, writ denied). The City's claim poses a purely legal question--the
interpretation of section 122.4(i)--which will not benefit from the development of additional facts
in connection with a specific permit application. The TNRCC asserts that the issues are not fit for
decision because the City has failed to challenge a final agency action. Citing provisions in the
Water Code and the Administrative Procedure Act (APA), the TNRCC emphasizes that judicial
review is limited to agency rulings, orders, decisions, or other acts, or the validity or applicability
of a rule. See Tex. Water Code Ann. § 5.351 (West 2000); Tex. Gov't Code Ann. § 2001.038 (West
2000).

 The City, however, has asserted a different basis for its lawsuit, specifically, sections
37.002-.004 of the Uniform Declaratory Judgments Act (UDJA). See Tex. Civ. Prac. & Rem. Code
Ann. §§ 37.002-.004 (West 1997). Under that Act, a claimant's access to judicial review is not
limited to review of agency rules; instead, the Act provides a basis by which a claimant can obtain
a declaration of rights, status, or other legal relations under a writing or a statute. See id. § 37.004. 
A suit under the UDJA is not confined to cases in which the parties have a cause of action apart from
the Act itself. Texas Dep't of Pub. Safety v. Moore, 985 S.W.2d 149, 153 (Tex. App.--Austin 1998,
no pet.). The legislature intended the UDJA to be remedial, to settle and afford relief from
uncertainty and insecurity with respect to rights, and to be liberally construed. Tex. Civ. Prac. &
Rem. Code Ann. § 37.002; Moore, 985 S.W.2d at 153.

 The TNRCC also questions the fitness of the issues for decision, asserting that the
City's request will affect additional parties who are not present to defend their interests. The City
responds that it is questionable that any such additional parties would have adequate standing to
participate in a challenge to an individual permit. Furthermore, the TNRCC's assertion does not go
directly to the ripeness inquiry, which determines when an action may be brought, that is, "whether
the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than
being contingent or remote." See Patterson, 971 S.W.2d at 442. The facts have sufficiently
developed as between the TNRCC and the City such that the dispute is not hypothetical. In addition,
an interested party may intervene in the proceedings on remand. See Tex. R. Civ. P. 60.

 Moreover, the denial of judicial review will result in hardship to the City. Under the
APA, a permit issued in a contested case is final, even while an appeal is pending. See Tex. Gov't
Code Ann. § 2001.144. The effect of forcing the City to wait until the TNRCC has granted another
permit means, in effect, that Lake Waco could become more polluted with the additional discharge
while the parties litigate their dispute. Moreover, the City could suffer multiple harms from multiple
additional CAFOs, and be forced to make this same legal argument in numerous appeals. Thus, the
City's claim satisfies both prongs of the ripeness inquiry.

 Furthermore, the City's claim is appropriately brought pursuant to the Declaratory
Judgment Act. Under that act, a claimant must show that (1) a justiciable controversy exists as to
the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought. 
Moore, 985 S.W.2d at 153. There is a justiciable controversy between the parties regarding the
effect of section 122.4(i) on the agency's permitting process. The City asserts that the TNRCC has
a duty to improve the water quality of the impaired river segments without further delay, and that
the agency has no discretion to issue new CAFO permits until it takes these affirmative steps. The
TNRCC responds that it has the discretion to grant additional permits that do not worsen the
environmental status quo. A declaration regarding the effect of section 122.4(i) on the agency's
authority to issue new CAFO permits will resolve this controversy. Therefore, we hold that the trial
court had jurisdiction to hear the City's claim under the UDJA and that the issue is ripe for
adjudication. (8)


CONCLUSION


 Because we find that the City's declaratory judgment request turns on a purely legal
issue, we reverse the order of dismissal and remand this cause for consideration of the issue
presented.


MOTION FOR REHEARING


 We write to refute the claim asserted in TNRCC's motion for rehearing that resolving
this controversy under the UDJA will effect a "sea change" in appeals from administrative agencies. 
The City is not appealing from a specific agency action and is not challenging the validity or
application of an agency rule; rather, it is asserting rights it feels it is afforded under the Texas Water
Code, as implemented by certain regulations, specifically section 305.538, which incorporates
federal regulation section 122.4. See 30 Tex. Admin. Code § 305.538 (1999); 40 C.F.R. § 122.4
(2001). The only ground for dismissal asserted by TNRCC was that the controversy is hypothetical
and not ripe for adjudication apart from a specific permit application. 

 At issue in this dispute is the effect of section 122.4(i) on TNRCC's discretion to
issue new permits to CAFOs that discharge into a water segment that has been found to be impaired. 
The City insists this regulation obligates the TNRCC to develop load allocations and compliance
schedules to improve the water quality before issuing new discharge permits. The TNRCC urges
that the regulation merely limits its issuance of new permits to those dischargers who would not
worsen the status quo of the water quality. 

 The present controversy concerns the protection state law affords a water segment
once it has been found to be impaired. We find the controversy indistinguishable from the question
sought to be resolved under the UDJA in Texas Department of Public Safety v. Moore, 985 S.W.2d
149 (Tex. App.--Austin 1998, no pet.). The City asserts its rights to have the TNRCC follow the
mandate of section 122.4(i), just as Mr. Moore asserted his right to have the Department of Public
Safety apply its own promotional rules in filling vacancies. See id. at 154. Just as the Department
had adversely affected Mr. Moore's rights by not requiring competitive examinations in filling
several vacancies in succession, see id., the City asserts that the TNRCC has adversely affected its
rights by not adopting load allocations and compliance schedules for the Bosque River before
granting new permits to dischargers. The purpose of the UDJA is to clarify the nature of rights
asserted under state law, as we recognized in Moore: "Moore's interest in being treated according
to statute when applying for vacant positions in the Department clearly implicates the UDJA's
purpose of clarifying rights affected by statute." Id. Because the City is alleging that the TNRCC
is granting permits without following the mandates of section 122.4(i), sovereign immunity does
not bar this suit. See id. ("Because Moore's suit under the UDJA sought a declaration that the
Department acted outside its statutory authority[,] . . . Moore's suit was not barred by sovereign
immunity."). The only remaining question we ask is whether this dispute is hypothetical or whether
it presents a real controversy that will be resolved by the declaratory relief sought. Because we hold
that the City is not seeking an advisory opinion but a declaration of what protection it is afforded
under section 122.4(i), as made applicable by the TNRCC's rules and as made mandatory by the
TNRCC's statute, we overrule the motion for rehearing. See Tex. Water Code Ann. § 5.103(c)
(West Supp. 2002) (stating that the TNRCC "shall follow its own rules") (emphasis added). (9)



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Reversed and Remanded

Filed: May 9, 2002

Publish

1. The TNRCC filed a motion to dismiss the Dairymen's appeal on the ground that legislative
action had mooted the association's appeal. Because the Dairymen voluntarily dismissed their
appeal, we overrule the TNRCC's motion.
2. The TNRCC's motion to dismiss the Dairymen's and the City's claims asserted mootness
and ripeness grounds. After a hearing, the trial court granted the motion. The order states that
"[a]fter considering the motion, the responses, and the evidence filed in support of the motion and
responses, the court: GRANTS the motion and DISMISSES [the consolidated causes]." In its brief,
the TNRCC asserts that the City's claims is moot and not ripe. While the City's original claims may
have been rendered moot by the TNRCC's action revoking its order, it amended its petition to state
a different claim based on the TNRCC's policy. We conclude therefore that the issue should be
analyzed in terms of ripeness.

3. Under the Clean Water Act, the TNRCC is also required to develop a "continuing planning
process" for reducing the pollution and bringing the water segments up to state water quality
standards for nutrients and pathogens. See 33 U.S.C. § 1313(e) (2001). This process must include,
in part, plans for "effluent limitations and schedules of compliance at least as stringent as those
[required under provisions of the Clean Water Act]," "the incorporation of all elements of any
applicable area-wide waste management plans," total maximum daily loads for pollutants in
accordance with subsection (d), and "adequate implementation, including schedules of compliance,
for revised or new water quality standards." Id.
4. The TMDLs are based on data that was collected during the mid-1990s. The TNRCC has
noted similar concerns with the reliability of the data. An interagency memo states that the TMDL's
"demonstration of feasibility is based in large part on computer model simulations that estimated the
amount of dairy waste to be applied and otherwise disposed of based on the number of dairy cows
existing or permitted in the watershed. If the waste projection changes significantly due [to]
increasing number of animals, the model numbers are less useful for supporting TMDL approval."
5. The current administrative code is cited for convenience.
6. A CAFO that currently operates under a permit may also seek a permit for additional or
expanded uses. Section 122.4(i) applies only to a permit for a new source or discharger. See 40
C.F.R. § 122.4(i) (2001). Therefore, the City has stipulated that its appeal is limited to permits for
new CAFOs.
7. These are the rules that currently govern the CAFO permit process. See Tex. Water Code Ann.
§ 26.503(b)(1) (West Supp. 2002) (stating that an individual permit must "provide for management 
and disposal of waste in accordance with Subchapter B, Chapter 321, Title 30, Texas Administrative
Code").
8. The City also asserts that subsections (a) and (d) of section 122.4 place restrictions on the
TNRCC's permitting process. See 40 C.F.R. §§ 122.4(a), (d) (2001). Having found that the City's
claim under section 122.4(i) presents a ripe controversy, we need not consider these additional
arguments. 
9. We acknowledge our unfortunate use of the term "impaired" to describe the water quality of 
Lake Waco, as complained of in the motion for rehearing. We used impaired not as a term of art
under the Clean Water Act, but in its conventional sense of "diminished or damaged." To avoid any
confusion, we have substituted a new page one that says the water quality of Lake Waco "has been
adversely affected." In addition, in describing the procedural history of this lawsuit in footnote two,
we included a statement concerning the doctrines of mootness and ripeness to which the TNRCC
strongly objects in its motion for rehearing. We will modify the footnote as suggested by the
TNRCC.