# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00313-CV

**Texas Department of Insurance, Appellant**

**v.**

**Reconveyance Services, Inc., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. D-1-GN-06-000034, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

Concerned that the Texas Department of Insurance ("TDI"), without statutory authority to do so, had taken regulatory actions that effectively prevented it from doing business in Texas, Reconveyance Services, Inc. ("Reconveyance") sought declaratory relief under the Uniform Declaratory Judgments Act ("UDJA"). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2006). TDI challenged the district court's subject-matter jurisdiction, contending that separation-of-powers principles forbade the judicial branch from granting Reconveyance its requested relief and that Reconveyance's claim is not justiciable. The district court denied TDI's plea to the jurisdiction. TDI appeals the district court's order. *See id.* § 51.014(a)(8) (West Supp. 2006). We affirm.

## STANDARD AND SCOPE OF REVIEW

The subject matter jurisdiction of a trial court may be challenged through a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225-26 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex. 2000). The determination of whether a trial court has subject matter jurisdiction begins with the pleadings. *See Miranda,* 133 S.W.3d at 226. The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993)). Whether the pleader has met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.*

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226-27; *Elgin Indep. Sch. Dist. v. R.N.,* 191 S.W.3d 263, 272 (Tex. App.—Austin 2006, no pet.). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Miranda,* 133 S.W.3d at 227.

A defendant may also challenge the jurisdictional facts alleged by the plaintiff through the summary-judgment-like processes described in *Miranda*. *Hendee v. Dewhurst,* No. 03-06-00501-CV, ___ S.W.3d ___, ___ , 2007 Tex. App. LEXIS 4149, at * 30, (Tex. App.—Austin May 25, 2007, pet. denied); *see Miranda*, 133 S.W.3d at 227 (citing *Bland,* 34 S.W.3d at 555). "When a plea to the jurisdiction challenges the existence of facts alleged by the pleader to establish the trial court's subject matter jurisdiction, the trial court must consider relevant evidence submitted by the parties." *Hendee,* ___ S.W.3d at ___, 2007 Tex. App. LEXIS 4149, at * 24 (citing *Miranda,* 133 S.W.3d at 227). Here, TDI has not

challenged the jurisdictional facts alleged by Reconveyance, nor did it introduce jurisdictional evidence. It disputes only whether Reconveyance's pleadings are sufficient to affirmatively establish the district court's subject matter jurisdiction. Consequently, we assume the truth of the factual allegations contained in Reconveyance's pleadings. *Miranda,* 133 S.W.3d at 226.

Additionally, because Reconveyance introduced jurisdictional evidence in response to TDI's plea to the jurisdiction, we may consider this evidence in resolving the jurisdictional challenges TDI has raised. *Bland,* 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

## PLEADINGS AND JURISDICTIONAL EVIDENCE

Reconveyance pleads[1] that it is a Washington corporation that provides what it terms "post-closing mortgage release services" in various states that, to date, have not included Texas. It describes these services as follows:

> When a residential property buyer purchases a home with an existing mortgage, the current lender has no incentive to provide a release of that mortgage prior to closing. To do so in a transaction that does not ultimately close would create significant problems for the lender. The new lender is not willing to accept a title commitment that indicates it is in a second lien position. Therefore, the buyer and seller proceed with their closing without the formal filing of a release. After the closing of the transaction, the knowledgeable buyer may enlist the help of a service provider like Reconveyance Services, outside of closing the transaction, to ensure the timely release of the prior existing mortgage after closing.

---

[1] We rely on Reconveyance's Second Amended Petition. Although the live petition at the time of the district court's order on appeal was Reconveyance's First Amended Petition, TDI states that the new pleading "does not raise new substantive jurisdictional issues."

3

Reconveyance desires to offer its services in Texas. "To inform the most buyers of the need to have these releases filed," Reconveyance "planned on having title insurance companies list the service as an optional service with an optional charge." In its jurisdictional evidence, Reconveyance introduced an affidavit from Jan Hollenbeck in which she elaborates that "[a]s it does in other states, [Reconveyance] planned in Texas to have title insurance companies list its service as an optional additional service for buyers, for which [Reconveyance] would charge a $15 fee."

To understand Reconveyance's further allegations regarding the nature of its dispute with TDI, it is helpful to note some basic features of the statutes regulating the Texas title insurance industry. The legislature enacted the Texas Title Insurance Act[2] with the express intent "to completely regulate the business of title insurance, including the direct issuance of policies and the reinsurance of any assumed risks, to (1) protect consumers and purchasers of title insurance policies; and (2) provide adequate and reasonable rates of return for title insurance companies and title insurance agents." Tex. Ins. Code Ann. § 2501.002 (West 2006). To that end, the legislature has delegated to the insurance commissioner power to "fix and promulgate the premium rates to be charged by a title insurance company or by a title insurance agent for title insurance policies or for other forms prescribed or approved by the commissioner." *Id.* § 2703.151(a) (West 2006); *see generally id.* §§ 2703.152-.208 (West 2006) (procedures for setting premium rates). "Premium," in turn, is defined by the legislature as "the premium rates promulgated by the commissioner . . . and includes a charge for (A) title examination and closing the transaction . . . ; and (B) issuing the policy." *Id.* § 2501.003(8) (West 2006). Of particular importance here is the "closing the transaction" component of the "premium." The Act defines "closing the transaction" as follows:

---

[2] Tex. Ins. Code Ann. §§ 2501.001-2704.104 (West 2006).

4

(a) For purposes of this title, "closing the transaction" describes the investigation that is made:

(1) on behalf of a title insurance company, title insurance agent, or direct operation before the title insurance policy is issued; and

(2) to determine proper execution, acknowledgment, and delivery of all conveyances, mortgage papers, and other title instruments necessary to consummate a transaction.

(b) Closing the transaction includes a determination that:

(1) all delinquent taxes have been paid;

(2) in the case of an owner title insurance policy, all current taxes, based on the latest available information, have been properly prorated between the purchaser and seller;

(3) the consideration has been passed;

(4) all proceeds have been properly disbursed;

(5) a final search of the title has been made; and

(6) all necessary papers have been filed for record.

*Id.* § 2501.006 (West 2006).

Pursuant to these statutory delegations, the insurance commissioner has established a schedule of "basic premium rates" for title insurance policies, which "include the charge for title insurance, title examination, and closing the transaction." 28 Tex. Admin. Code § 9.1 (2007) (adopting *Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas* [hereinafter *Basic Manual*] as amended effective January 20, 2006, *available at* www.tdi.state.tx.us/company/titleman.html

Rule R-1); *see Basic Manual* Procedural Rule P-1(w) (defining "premium" as "including the charges of title examination and for closing the transaction . . . and for issuance of a policy").[3]

The gravamen of Reconveyance's allegations is that nothing in these statutes and regulations gives TDI the authority to prohibit title insurers and agents from offering Reconveyance's post-closing release services to consumers for a fee in addition to premium, yet TDI is nonetheless purporting to do so. Reconveyance pleads that its "[p]ost closing mortgage release services" are not covered by the "premium" because they "are clearly not title insurance," "title examination," or "closing the transaction." "'[C]losing a transaction,'" it asserts, is:

> the investigation that is made . . . to determine proper execution, acknowledgment and delivery of all conveyances, mortgage papers, and other title instruments necessary to consummate a transaction, [and it] includes a determination that: (1) all delinquent taxes have been paid; (2) in the case of an owner title insurance policy, all current taxes, based on the latest available information, have been properly prorated . . . ; (3) the consideration has been passed; (4) all proceeds have been properly disbursed; (5) a final search of the title has been made; and (6) all necessary papers have been filed for record.

*See* Tex. Ins. Code Ann. § 2501.006; *see also Basic Manual* Procedural Rule P-1(f). "Accordingly," Reconveyance alleges, "closing the transaction does not contemplate affirmative efforts to secure a release from the prior existing mortgage," as "[a] title insurance operations closing duties are merely investigative and not corrective in nature" and "[t]he release of a prior existing mortgage is not a document necessary to consummate the transaction." It adds that other provisions of the insurance code and Basic Manual "contemplate [that] the release of a prior existing mortgage may never be filed of record and provide for insuring around the unreleased lien of record." Reconveyance further alleges that "[s]eparate charges can

---

[3] *See also Basic Manual* Procedural Rules P-1(e), (f), (p) (defining "title insurance," "title examination," and "closing the transaction").

6

be assessed for certain services outside the basic duties associated with title insurance, title examination, and closing the transaction." "One example of such service fees," Reconveyance states, "are notary fees, which the title insurance industry has long been permitted to assess."[4]

Reconveyance pleads that, "TDI has taken the position that these post-closing mortgage release services are covered by the title insurance premium and may not be the basis for a separate fee charged to the consumer." Specifically, Reconveyance alleges, "TDI maintains that post-closing mortgage release services are among the duties of a title agent that comprise 'closing the transaction' and therefore are included in the basic premium rate provided by Rate R-1 of the Basic Manual." It alleges that, as a result, "Title insurance companies and agents in Texas have informed Reconveyance Services they would use the services of Reconveyance Services if not for the position taken by TDI which precludes the title companies from charging for those services," and that "[s]ome of the same entities which use Reconveyance Services in other states would use the services of Reconveyance Services in Texas but for the actions of TDI." Reconveyance presented jurisdictional evidence concerning these assertions.

In her affidavit, Hollenbeck testified that "[u]nder the threat of disciplinary action and a fine from TDI, Texas title companies have not been willing to offer [Reconveyance's] services to residential property buyers. Several title companies, however, have indicated they would offer [Reconveyance's] services if TDI did not prohibit charging customers [Reconveyance's] $15 fee." She attached an email she had received from Robert York, TDI's Director, Title Examinations, which appears to respond to an earlier

---

[4] Reconveyance also cites section 550.001 of the insurance code for the proposition that "insurers and agents may collect service fees as well as premiums," thereby "encourag[ing] insurance operations to provide beneficial (yet non-required) services by permitting the assessment of fees in support of these services."

inquiry from Hollenbeck. York states, with reference to Reconveyance's proposal to charge its fee through title companies and agents:

> I have always said that I believe the [title] agents should be paying for the service and not the consumers. . . . [W]hen we see an agent charge the fee directly to the consumer we cite the agent for a rule violation and tell them that a fee is unauthorized. We currently have a pending disciplinary action (with fines recommended) against an agent for charging a fee for release tracking services.

York later concludes, "If a title agent asks me about a service such as the one you are providing, I will advise them of the points I mentioned above."

Hollenbeck also attached correspondence from representatives of two title companies, one of which, she testified, already offered Reconveyance's services in Washington and Oregon. One stated, with regard to Reconveyance's services, "I think it is a good program and would certainly recommend it to all our agents in Texas and other states," while the other stated "the services of Recoveyanc[e] Services, Inc., would be supported and entertained by our companies if the charge for such services was a pass through charge with acknowledgment as such by the Texas Department of Insurance."

Reconveyance requested declarations "that post-closing mortgage release services are not title insurance, title examination, nor 'closing the transaction,' and these services provided by Reconveyance Services may be offered to consumers for a fee by title companies or title agents in the State of Texas."

## ANALYSIS

In two issues, TDI complains that the district court erred in denying its plea to the jurisdiction because (1) separation-of-powers principles prevent judicial "review" of its interpretation of

8

"closing the transaction" under section 2501.006 of the insurance code; (2) Reconveyance's suit does not present a justiciable controversy but instead seeks an advisory opinion.

Our analytical starting point in cases, such as this one, involving disputes over whether a trial court or administrative agency has subject-matter jurisdiction over a dispute is article V, section 8 of the Texas Constitution. It provides that a district court's jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. The legislature has provided by statute that district courts possess "the jurisdiction provided by Article V, Section 8, of the Texas Constitution," and "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity." Tex. Gov't Code Ann. §§ 24.007-.008 (West 2004). Thus, "[c]ourts of general jurisdiction presumably have subject matter jurisdiction unless a contrary showing is made." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 220 (Tex. 2002).

Reconveyance brings its suit under the UDJA. The UDJA provides that a claimant "whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under [it] and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (West 1997). The legislature intended the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. *Id.* § 37.002(b) (West 1997); *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex. 1995).

The UDJA does not create or augment a trial court's subject-matter jurisdiction—it merely provides a remedy where subject-matter jurisdiction already exists. *See* Tex. Civ. Prac. & Rem. Code Ann.

9

§ 37.003(a) (West 1997) ("A court of record *within its jurisdiction* has power to declare rights, status and other legal relations . . . ." (emphasis added)); *Chenault v. Phillips,* 914 S.W.2d 140, 141 (Tex. 1996); *Texas Ass'n of Bus.,* 852 S.W.2d at 444. But while the UDJA cannot confer subject-matter jurisdiction in the absence of a cause of action within the court's jurisdiction, "[a] suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the Act itself." *Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex. App.—Austin 1998, no pet.).[5] That is, a UDJA action will lie within the subject-matter jurisdiction of the district courts when there is a (1) a justiciable controversy as to the rights and status of parties actually before the court for adjudication; and (2) that will be actually resolved by the declaration sought. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004); *Beadle,* 907 S.W.2d at 467 (citing *Texas Ass'n of Bus*, 852 S.W.2d at 446).

As this Court has repeatedly recognized, a justiciable controversy regarding whether a state agency or officer has acted beyond statutory authority provides a jurisdictional basis for a UDJA action seeking statutory construction of that authority.[6] This type of UDJA action, furthermore, does not implicate sovereign immunity. *Texas Highway Comm'n v. Texas Ass'n of Steel Imps., Inc.,* 372 S.W.2d 525, 530-31 (Tex. 1963); *Cobb v. Harrington,* 190 S.W.2d 709, 712 (Tex. 1945); *see also Texas Natural*

---

[5] *See also Bexar Metro. Water Dist. v. City of Bulverde,* 156 S.W.3d 79, 90 (Tex. App.—Austin 2004, pet. denied); *Juliff Gardens, L.L.C. v. Texas Comm'n on Envtl. Quality,* 131 S.W.3d 271, 276-77 (Tex. App.—Austin 2004, no pet.); *City of Waco v. Texas Natural Res. Conservation Comm'n,* 83 S.W.3d 169, 175 (Tex. App.—Austin 2002, pet. denied).

[6] *See, e.g., Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870, 874-75 (Tex. App.—Austin 2006, pet. denied) (claim that agency's issuance of advisories inconsistent with statutory requirements was outside of agency's statutory authority); *Sweeney v. Jefferson,* 212 S.W.3d 556, 564-65 (Tex. App.—Austin 2006, no pet.) (whether defendants removed plaques without historical commission approval and without statutory authority); *Texas Mun. Power Agency v. Public Util. Comm'n,* 100 S.W.3d 510, 516 (Tex. App.—Austin 2003, pet. denied) (a UDJA action "to interpret the scope of an agency's statutory authority . . . is sufficient to invoke the trial court's jurisdiction").

*Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority."); *cf. Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265-66 (Tex. 1980) (if the complained-of acts of a state official are illegal or outside his statutory authority, "an entity or person whose rights have been violated . . . may bring suit to remedy the violation or prevent its occurrence, and such suit is not a suit against the State requiring legislative or statutory authorization"). This principle derives from the traditional distinction between lawful acts of the state, to which sovereign immunity attaches, and wrongs committed by individuals ostensibly in the name of the state—which, in turn, reflects basic constitutional and democratic principles:

> This distinction is essential to the idea of constitutional government. To deny it or blot it out obliterates the line of demar[c]ation that separates constitutional government from absolutism, free self-government based on the sovereignty of the people from that despotism, whether of the one or the many, which enables, the agent of the state to declare and decree that he is the state—to say, "L'etat c'est moi." Of what avail are written Constitutions, whose Bills of Right for the security of individual liberty have been written, too often, with the blood of martyrs shed upon the battlefield and the scaffold, if their limitations and restraints upon power may be overpassed with impunity by the very agencies created and appointed to guard, defend, and enforce them; and that, too, with the sacred authority of law, not only compelling obedience, but entitled to respect? And how else can these principles of individual liberty and right be maintained, if, when violated, the judicial tribunals are forbidden to visit penalties upon individual offenders, who are the instruments of wrong, whenever they interpose the shield of the state? The doctrine is not to be tolerated. The whole frame and scheme of the political institutions of this country, state and federal, protest against it. Their continued existence is not compatible with it.[7]

*Imperial Sugar Co. v. Cabell,* 179 S.W. 83, 89 (Tex. Civ. App.—Galveston 1915, no writ) (citations omitted), *cited in Cobb*, 190 S.W.2d at 712.

---

[7] The court went on to add that, "It is the doctrine of absolutism, pure, simple, and naked, and of communism, which is its twin—the double progeny of the same evil birth." *Imperial Sugar Co. v. Cabell,* 179 S.W. 83, 89 (Tex. Civ. App.—Galveston 1915, no writ).

These principles apply no less to the modern administrative state.[8]  In fact, administrative agencies possess *only* those powers the legislature has expressly granted them by statute, together with those necessarily implied from the statutory authority conferred or duties imposed.  *See Public Util. Comm'n v. GTE-Southwest, Inc*., 901 S.W.2d 401, 407 (Tex. 1995); *see also City of Houston v. Clark,* 197 S.W.3d 314, 324 (Tex. 2006) (confirming the continued viability of the delegation doctrine—the historical constitutional mooring of the administrative state within a government founded on separation-of-powers principles).

Accordingly, Texas courts have routinely permitted UDJA claims challenging agency actions as beyond statutory authority and seeking a construction of that authority.  *E.g., Cobb*, 190 S.W.2d at 712 (UDJA claim seeking declaration that plaintiffs were not "motor carriers" subject to tax was not a suit against the state that implicated sovereign immunity); *Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870, 874-75 (Tex. App.—Austin 2006, pet. denied) (UDJA claim seeking declaration that agency's issuance of advisories inconsistent with statutory requirements was beyond agency's statutory authority).  Construing Reconveyance's pleadings liberally and taking them as true, as we must, Reconveyance has pled this type of claim: it alleges that TDI has no statutory authority to regulate or prohibit title agents and insurers from charging a separate fee to provide Reconveyance's services, asserts that the agency is acting beyond its statutory authority in purporting to do so, and seeks a declaration construing the agency's statutory authority to commit these actions.  Thus, Reconveyance's

---

[8]  *See*, *e.g*., Hon. John E. Powers, *Agency Adjudications* 5-6 (1990) (observing, with regard to the concerns that motivated the Administrative Procedure Act, that "[a]dministrative government required a bureaucracy—an apparatus that was always expensive and sometimes arrogant, wasteful, indifferent, intimidated, inflexible, or obsessed with prerogative and power . . . [or] subverted or controlled by the regulated interests in one particular or another").  Such are the ills tending from governmental power unchecked by law, regardless of the good faith of individual public servants.

claim is within the district court's jurisdiction if (1) Reconveyance has alleged a justiciable controversy regarding the scope of TDI's statutory authority; and (2) the district court's jurisdiction over Reconveyance's UDJA claim has not been divested by the legislature's grant of jurisdiction to TDI to regulate the title insurance industry.

**Agency jurisdiction**

In its first issue, TDI attempts to invoke several related principles that apply when the legislature has delegated jurisdiction to an agency to make an initial determination in a dispute. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 173 (Tex. 2004) ("In Texas, a person may obtain judicial review of an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right.") (citing *Continental Cas. Ins. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 397 (Tex. 2000); *Firemen's & Policemen's Civil Serv. Comm'n v. Kennedy,* 514 S.W.2d 237, 239 (Tex. 1974); *and City of Amarillo v. Hancock,* 239 S.W.2d 788, 790 (Tex. 1951)); *Westheimer Indep. Sch. Dist. v. Brockette,* 567 S.W.2d 780, 785 (Tex. 1978) ("Courts generally hold that administrative bodies are entitled to and should exercise the duties and functions conferred by statute without interference by the courts. It follows, however, that intervention by the court in administrative proceedings may be permissible when an agency is exercising authority beyond its statutorily conferred powers."); *Texas Comm'n of Licensing & Regulation v. Model Search Am., Inc.,* 953 S.W.2d 289, 291 (Tex. App.—Austin 1997, no writ) ("The separation of government powers mandated in the State constitution forbids a court to review the actions of an administrative agency unless the legislature has, in a proper statute, authorized a cause of action for that purpose or the plaintiff complains the agency action is ultra vires or

13

unconstitutional in its effect upon the plaintiff or his property."). The application of these principles, however, turns on the nature of jurisdiction, if any, that the legislature has delegated to the agency.

As noted, the legislature enacted the Texas Title Insurance Act "to completely regulate the business of title insurance, including the direct issuance of policies and the reinsurance of any assumed risks, to (1) protect consumers and purchasers of title insurance policies; and (2) provide adequate and reasonable rates of return for title insurance companies and title insurance agents." Tex. Ins. Code Ann. § 2501.002. A person engages in the "business of title insurance" if the person "as insurer, guarantor, or surety, makes or proposes to make a contract or policy of title insurance or its equivalent," or "transacts or proposes to transact any phase of title insurance," including soliciting; title examination other than an examination conducted by an attorney; closing the transaction other than a closing conducted by an attorney; executing a contract of title insurance; insuring and transacting matters arising out of the contract after the contract is executed, including reinsurance; or making a guaranty or warranty of a title search or a title examination, or any component of a title search or title examination, if the person is not the person who performs the search or examination. *Id.* § 2501.005(a) (West 2006). Further, a person engages in the "business of title insurance" if the person engages in or proposes to engage in any business "that is substantially equivalent to the business of title insurance as described by this section, regardless of whether that conduct is performed in a manner designed to evade the provisions of this title." *Id.* § 2501.005(b). TDI is charged generally with administering the Act. *Id.* § 31.002(1), (3) (West 2006) (TDI shall "regulate the business of insurance in this state" and "ensure that this code and other laws regarding insurance and insurance companies are executed"). It has also been delegated specific powers that, in addition to its rate-making power, include licensing and enforcement powers over title insurers, title agents, and others

14

engaged in the "business of title insurance." *Id.* §§ 2551.101-.102, 2551.351-.354, 2552.101-.108, 2552.254, 2552.301-.302, 2651.001-.010, 2651.051-.055, 2651.157, 2651.301-.302 (West 2006).

Implicit in a regulatory scheme like the Act is the power of TDI to interpret the statutes it is charged with administering and enforcing. *See Beacon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 266-67 (Tex. App.—Austin 2002, no pet.) (TDI had authority to state position regarding proper construction of policy form because it "is expressly authorized by the Insurance Code to regulate insurance policies and insurer claims practices"); *see also Model Search*, 953 S.W.2d at 290 (department of licensing and regulation staff "had the undoubted authority to interpret the Act's provisions and to make a decision" informally advising corporation that its activities fell within agency's regulatory authority). This is the power on which TDI predicates its jurisdictional arguments. TDI asserts that the courts have no power to "interfere with" or "review" its interpretation of "'closing the transaction' in the course of its regulatory duties."

TDI's claim of jurisdiction fails for several reasons. First, TDI overlooks that a UDJA claim is *sui generis* and not necessarily controlled by whether an alternative administrative remedy is or is not made available. *Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex. 1970); *Cobb,* 190 S.W.2d at 713. More importantly, TDI obscures the fact that it has not been granted jurisdiction to decide the dispute presented in Reconveyance's UDJA action. As TDI acknowledges, Reconveyance does not fall within its regulatory jurisdiction over the "business of title insurance" and TDI has not, and cannot, initiate a proceeding against Reconveyance.

Unlike courts, "there is no presumption that administrative agencies are authorized to resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory language, confers upon them." *David McDavid Nissan,* 84 S.W.3d at 220. "Courts will not imply

15

additional authority to agencies, nor may agencies create for themselves any excess powers." *Id.* The courts are not divested by an agency of the subject-matter jurisdiction they would otherwise possess to adjudicate a dispute unless the legislature has granted the agency exclusive jurisdiction, or the sole power to make the initial determination in the dispute. *Id.* at 221; *Bexar Metro. Water Dist. v. City of Bulverde,* 156 S.W.3d 79, 90 (Tex. App.—Austin 2004, pet. denied). Whether an agency has exclusive jurisdiction is determined by construction of the relevant statutory scheme. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006). The legislature's intent to grant an agency the sole authority to make the initial determination in a dispute may be reflected in either express statutory language to that effect or the overall statutory scheme. *Id*. at 340-42.

TDI has not suggested that it possesses *exclusive* jurisdiction—i.e., that the legislature has divested the district court of the jurisdiction it would otherwise possess over Reconveyance's UDJA claim—to decide the proper construction of "closing the transaction" as it bears upon TDI's statutory powers. Nor does the Texas Title Insurance Act give TDI such broad power, at least outside the context of the proceedings it can initiate against title insurers and agents. TDI, again, acknowledges that it has no power to initiate such proceedings against Reconveyance.

TDI also does not assert that principles of primary jurisdiction would require the district court to defer to TDI's power to construe "closing the transaction" in the course of its legislatively-delegated regulatory duties. "Primary jurisdiction" is not truly a jurisdictional limitation, but a judicially-created concept of prudential limitation. *David McDavid Nissan, Inc.,* 84 S.W.3d at 220-21. The primary jurisdiction doctrine operates to allocate power between courts and agencies when *both* have the authority to make the initial determination regarding a dispute or issue. *Id.* at 221. It holds that trial courts should allow an administrative agency to initially decide an issue when: (1) the agency is staffed with experts

16

trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations. *In re Southwestern Bell Tel. Co.,* 226 S.W.3d 400, 403 (Tex. 2007).

The primary jurisdiction doctrine does not apply for several reasons. Most obviously, the legislature has not provided Reconveyance an administrative proceeding through which it could obtain a decision regarding "closing the transaction" and TDI's statutory authority, to which the district court could defer.[9] Moreover, as the parties have framed the dispute, Reconveyance's UDJA claim turns entirely on a question of statutory construction—the meaning of "closing the transaction" under section 2501.006 of the insurance code. TDI has not suggested that any other issue would be relevant to Reconveyance's entitlement to the declaratory relief it seeks.[10] A longstanding corollary or exception to the primary jurisdiction doctrine recognizes that "[w]here the issue is one inherently judicial in nature . . . the courts are not ousted from jurisdiction unless the Legislature, by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body." *Gregg v. Delhi-Taylor Oil Corp.,* 344 S.W.2d 411, 415 (Tex. 1961). This Court has applied this "inherently judicial" concept to statutory-construction issues, *Bexar Metro. Water Dist.,* 156 S.W.3d at 90 ("Construing a statute is an inherently judicial function, and

---

[9] The sole provision of the Act that would appear potentially to provide any forum for Reconveyance to state its views is section 2703.203, which requires the insurance commissioner to hold a biennial hearing concerning rulemaking and ratemaking concerning regulation of the business of title insurance. Tex. Ins. Code Ann. § 2703.203-.205 (West 2006).

[10] For example, while TDI questions Reconveyance's reliance on section 550 of the insurance code, contending that the provision does not apply to the title insurance act, TDI has not asserted that the commissioner would have statutory power to prohibit the assessment of a separate fee for post-closing release services if such services are *not* included in the "premium," nor suggested that the existence of any such power would be relevant to our jurisdictional inquiry.

17

courts are not deprived of their jurisdiction unless a statute explicitly grants an administrative agency exclusive jurisdiction."), reasoning that "[s]tatutory interpretation or construction is not something that needs to be left to the [agency] to decide. The [agency] has no expertise that is greater than the courts in determining what a statute means." *Id.*; *see also Juliff Gardens, L.L.C. v. Texas Comm'n on Envtl. Quality,* 131 S.W.3d 271, 279 (Tex. App.—Austin 2004, no pet.) (applying "inherently judicial" concept to constitutional questions). Although what are termed "statutory construction" issues sometimes may entail embedded fact issues that counsel deference to agency proceedings, *see Texas Ct. Reps. Certification Bd. v. Esquire Deposition Servs.,* No. 03-06-00002-CV, ___ S.W.3d ___, ___, 2007 Tex. App. LEXIS 5701, at *3 (Tex. App.—Austin July 20, 2007, no pet. h.), that is not the case here. The legislature has defined the term "closing the transaction" under section 2501.006 of the insurance code with clarity and specificity, the parties have joined issue on the question of whether Reconveyance's services fall within it, and there appear to be no material fact disputes concerning the nature of Reconveyance's services. *See* Tex. Ins. Code Ann. § 2501.006. In short, there is nothing about this dispute warranting a departure from the general rule that statutory construction is a question of law and for the courts to decide, *Bexar Metro. Water Dist.,* 156 S.W.3d at 90, and neither party has suggested otherwise.

We also observe that the underlying purposes of the primary jurisdiction doctrine arguably have already been satisfied here. There is no dispute that TDI has made a form of initial determination regarding the proper construction of "closing the transaction." It concedes that the email from its Director of Title Examinations "expressed *TDI's position on the matter*: that such a fee may not be passed directly on to the consumer and if Reconveyance's services are used, the cost should be paid by the title agent or company and should not be passed on to the consumer."

18

As TDI cannot demonstrate that it has been delegated exclusive jurisdiction over the issues presented by Reconveyance's UDJA claim, the district court possesses subject-matter jurisdiction over the claim if it is justiciable. Texas Constitution art. V, § 8, Tex. Gov't Code Ann. §§ 24.007-.008; *David McDavid Nissan, Inc.,* 84 S.W.3d at 220. Nor does primary jurisdiction require the district court to defer to TDI. The dissent nonetheless suggests that because TDI has authority to construe the statutes it administers (as agencies generally do), TDI's assertions of authority predicated on the agency's alleged misinterpretations of these statutes are insulated from judicial scrutiny.[11] Although the concept that an agency's "deciding wrongly" regarding an issue is not *ultra vires* may have application where the legislature has delegated the agency exclusive jurisdiction to decide that issue, e.g., *North Alamo Water Supply Corp. v. Texas Dep't of Health,* 839 S.W.2d 455, 458-59 (Tex. App.—Austin 1992, writ denied),[12]

---

[11] The dissent urges "[i]t is precisely for this reason that courts will traditionally defer to an agency's reasonable construction of the statute the agency is charged with enforcing." ___ S.W.3d at ___ n.5 (Patterson, J., dissenting). In fact, this concept contemplates only that courts may "*consider* the agency's interpretation of its own powers *only* if that interpretation is reasonable and not inconsistent with the statute." *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 316 (Tex. 2001) (emphases added). "We are not bound, however, by the [agency's] interpretation." *Rylander v. Fisher Controls, Inc.,* 45 S.W.3d 291, 299 (Tex. App.–Austin 2001, no pet.). Further, "[c]ourts do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *Id.* at 302 (quoting 2B Singer, Sutherland Statutory Construction § 49.04, at 23-24). Some statutory construction questions, this Court has held, may fall into that category. *Id.* (holding that "the task of statutory construction does not here involve a matter lying within agency expertise. It involves instead a non-technical question of law—legislative intent—determined from the legislature's use of the term "not subject to taxation" in context and based on the ordinary meaning of those words. Courts are as competent as the Comptroller in making that assessment of legislative intent. This reduces considerably the degree of judicial deference owed the Comptroller's interpretation.").

[12] We agree with the dissent and Professor Beal that where an agency has exclusive jurisdiction over a dispute, treating *every* question of statutory construction implicated by the dispute as going to the agency's "statutory authority" would cause the *ultra vires* exception to exhaustion-of-remedies requirements to swallow the rule. ___ S.W.3d at ___ (Patterson, J., dissenting) (citing Ronald L. Beal, 2 *Texas Administrative Practice and Procedure* § 12.2, at 12-49 (2006)); *see also Cobb,* 190 S.W.2d at 714 ("We do not hold that the declaratory judgment procedure may be used

agencies do not have general authority to misapply the law when asserting their regulatory powers in other contexts. Again, it is well-established that Texas courts have subject-matter jurisdiction to declare illegal or enjoin agencies' acts that misinterpret and misapply the laws they are charged with administering. *See Cobb*, 190 S.W.2d at 713 (UDJA claim seeking declaration that plaintiffs were not "motor carriers" subject to tax under statute); *see also Camacho v. Samaniego,* 954 S.W.2d 811, 819 (Tex. App.—El Paso 1997, pet. denied) (observing that *Cobb* involved comptroller's illegal tax collection based on a mistaken interpretation of law made within the scope of his statutory authority).

Under the bedrock jurisprudential principles reflected in *Cobb*, we conclude that any powers granted to TDI by the legislature do not divest the district court of its subject-matter jurisdiction to adjudicate Reconveyance's UDJA claim or require the court to defer its proceedings. We overrule TDI's first issue.

**Justiciability**

In its second issue, TDI contends that Reconveyance has failed to plead a justiciable controversy that could support the district court's subject-matter jurisdiction over its UDJA claim. "To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Beadle*, 907 S.W.2d at 467 (quoting *Bexar-Medina-Atascosa Counties Water Control & Improvement Dist. No. 1 v. Medina Lake Prot. Ass'n,* 640 S.W.2d 778, 779-80 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.). In this regard, TDI argues that

---

when a statute provides an administrative board or other special tribunal or special procedure for the particular type of case in hand as, for example, a workmen's compensation case."). But again, the legislature has not delegated TDI such jurisdiction here.

20

(1) Reconveyance has suffered no "concrete injury" on which to base its suit, (2) its suit is not ripe, and (3) it lacks standing.

Ripeness and standing are related doctrines of justiciability: each is a threshold question that implicates subject matter jurisdiction and each emphasizes the necessity of a concrete injury for a justiciable claim to be presented. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex. 2000) (citing *Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex. 1998)). Ripeness and standing, like other justiciability doctrines, derive from the constitutional prohibition against advisory opinions, which in turn stems from separation-of-powers principles. *Patterson,* 971 S.W.2d at 442.

Ripeness concerns whether, at the time a lawsuit is brought, the facts have developed sufficiently such that an injury has occurred or is likely to occur, rather than being contingent or remote. *Id*. A case is not ripe when its resolution depends upon contingent or hypothetical facts or upon events that have not yet come to pass. *Gibson,* 22 S.W.3d at 852. The constitutional prohibition against issuing advisory opinions also has a pragmatic, prudential aspect that aims to conserve "judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Patterson*, 971 S.W.2d at 443 (quoting *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex. 1998)). In the administrative law context, moreover, avoiding premature litigation over administrative determinations prevents courts from "entangling themselves in abstract disagreements over administrative policies" while simultaneously allowing them to postpone interfering when necessary so that other branches of government and governmental agencies may perform their functions unimpeded*. Id*. These factual and prudential concerns underlie the court's determination of ripeness, in which it considers: (1) the fitness of the issues for judicial review, and (2) the hardship occasioned to a party by the court's denying judicial review. *Perry v. Del Rio,* 66 S.W.3d 239, 250 (Tex. 2001) (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)).

21

Standing differs from ripeness because ripeness questions when an action may be brought, while standing concerns who may bring an action. *Patterson*, 971 S.W.2d at 442. Standing is implicit in the concept of subject matter jurisdiction. *Texas Ass'n of Bus.,* 852 S.W.2d at 443. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. *Id.* The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Id*. at 446 (citing *Board of Water Eng'rs v. City of San Antonio,* 283 S.W.2d 722, 724 (Tex. 1955)). An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *Id.* at 444. In many cases, the standing and ripeness inquiries merge: a party may lack standing because what happened to him is not far enough developed, but that lack of development may also render the action unripe. *Patterson,* 971 S.W.2d at 442.

We further observe that while the UDJA does not supersede these justiciability requirements, a person seeking declaratory relief need not have yet incurred actual injury of the sort for which consequential relief might be granted. *Bexar Metro. Water Dist.,* 156 S.W.3d at 88 (citing *City of Waco v. Texas Natural Res. Conservation Comm'n,* 83 S.W.3d 169, 175 (Tex. App.—Austin 2002, pet. denied) *and Texas Dep't of Banking v. Mount Olivet Cemetery Ass'n,* 27 S.W.3d 276, 282 (Tex. App.—Austin 2000, pet. denied)). Instead, the UDJA is intended to provide a means to determine the rights of parties when a controversy has arisen, but before any wrong has actually been committed, and is preventative in nature. *Id.* For example, courts have issued declaratory judgments construing statutes before the statutes are violated. *Id.* at 88-89.

In contending that Reconveyance has failed to plead a concrete injury, standing, or ripeness, TDI makes four primary contentions: (1) Reconveyance's asserted injury is premised on the "hypothetical future events" that title insurers and agents will actually do business with Reconveyance if it obtains the declarations it seeks; (2) Reconveyance is a "foreign corporation" with "no right to conduct business in Texas without complying with all statutory conditions," and who cannot claim injury from TDI's "[p]reventing [its] future business plan from reaching fruition"; (3) Reconveyance cannot show injury or hardship because it is not regulated by TDI or subject to any enforcement actions; and (4) Reconveyance improperly seeks "review" of an "informal advisory opinion."

In support of its first contention, TDI equates this case with *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764 (Tex. App.—Austin 1999, no pet.). *Brinkley*, like this case, involved a UDJA claim brought by a party who, while not directly regulated by an agency, claimed injury from the agency's allegedly unlawful actions that deterred its licensees from doing business with the party. Brinkley owned "eight-liner" gaming machines, leasing space to operate such machines in bingo parlors. Bingo parlors, but not Brinkley, were licensed by the Texas Lottery Commission and regulated under the Bingo Enabling Act. The Act prohibited bingo parlors from allowing operation of "gambling devices" on their premises. Responding to inquiries, the commission sent its licensees a letter setting forth criteria by which the licensees could determine the legality of machines in their parlors and warning of potential administrative and criminal penalties if they permitted operation of illegal machines. *Id*. at 766-67. Brinkley sued the commission under the UDJA seeking that eight-liners were not "gambling devices" under the penal code and that the commission's interpretation of the code was unconstitutional. *Id*. at 767. He alleged that he sustained "irreparable injury to vested property rights with no adequate remedy at law" because his lessor,

23

"as a result" of the commission's letters, demanded that he remove his machine, and that he was prevented from operating his machines in other bingo parlors. *Id.* at 767-68.

This Court concluded, "We believe Brinkley's cause of action under the UDJA requires an advisory opinion." *Id.* at 768. It observed that Brinkley was not a licensee subject to the commission's regulation, and that no licensees were parties. *Id.* As for whether Brinkley nonetheless had a justiciable interest arising from the adverse economic impact of the commission's actions, the Court summarily dismissed that possibility. Without elaboration, it stated that, "Brinkley necessarily speculates that a declaratory judgment, holding that eight-liners are not gambling devices, may induce his lessor or other bingo-parlor licensees to allow him to operate his machines, however configured, in their parlors. This is a contingency, an uncertainty, a hypothesis upon which a court may not decide the legal issues raised in Brinkley's petition." *Id*.

*Brinkley* does not control this case. Under our standard of review, Reconveyance's UDJA claim cannot be dismissed as based on merely speculative or hypothetical business loss. Reconveyance explicitly alleges that: "Title insurance companies and agents in Texas have informed Reconveyance Services *they would use* the services of Reconveyance Services *if not for* the position taken by TDI which precludes the title companies from charging for those services," and that "[s]ome of the same entities which use Reconveyance Services in other states *would use* the services of Reconveyance Services in Texas *but for* the actions of TDI." (Emphasis added.) Similarly, Jan Hollenbeck testified that, "Several title companies . . . have indicated they *would offer* [Reconveyance's] services if TDI did not prohibit charging customers [Reconveyance's] $15 fee." (Emphasis added.)[13] TDI did not challenge these factual

---

[13] Further, as noted, Reconveyance introduced letters from two title insurers stating that its services would "certainly [be] recommend[ed]" to "all of our agents in Texas and in other states" and "would be supported and entertained by our companies if the charge for such services was a pass

allegations or introduce contrary jurisdictional evidence. Accordingly, we must take these allegations as true, and construe them liberally. *Miranda*, 133 S.W.3d at 226; *see also Sweeney v. Jefferson*, 212 S.W.3d 556, 564-65 (Tex. App.—Austin 2006, no pet.). These facts distinguish Reconveyance's claim from that of Brinkley.

This type of actual or threatened business injury from the effects of agency action gives rise to a justiciable interest that can support Reconveyance's UDJA claim. *See also Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 721-27 (Tex. 2001) (discussing Texas's longstanding recognition of common-law tort for tortious interference with prospective business relations). TDI's contentions that Reconveyance cannot possess such an interest because it is a "foreign corporation" or is seeking to implement a "future business plan" are without merit.[14]

Nor are we persuaded that Reconveyance cannot be injured or "affected" under the UDJA merely because it is not regulated by TDI or subject to its enforcement authority. As this Court has recognized, a party not directly regulated by an agency may nonetheless be "affected" and injured by the

_____

through charge with acknowledgment as such by the Texas Department of Insurance." Reconveyance already has an ongoing business relationship with one of these insurers, which offers Reconveyance's services to customers in Washington and Oregon. Although these statements are not necessarily *conclusive* proof that the insurers would do business with Reconveyance if it obtained its desired declaration, they are evidence consistent with Reconveyance's unchallenged pleadings.

[14] TDI's arguments to this effect appear to rely on a misapplication of a statement in *Model Search* that "a foreign corporation . . . possesses no right to transact business in Texas without complying with all statutory conditions that pertain to the matter." *See Model Search Am., Inc.,* 953 S.W.2d at 292. This statement referred to whether a corporation possessed a vested property interest such that the agency's action implicated due process and gave rise to an inherent right of judicial review from an agency order. *Id.* at 291-92. It does not stand for the propositions that foreign corporations can never be injured or "affected" under the UDJA by an agency's actions or that such entities are without a legal remedy if agencies exceed their delegated powers to a corporation's detriment. *See Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex. 1970) (UDJA action is *sui generis*); *Cobb,* 190 S.W.2d at 713 (same).

agency's actions. In *City of Waco v. Texas Natural Res. Conservation Comm'n,* 83 S.W.3d 169, 178-79 (Tex. App.—Austin 2002, pet. denied), the Court reversed the dismissal of a declaratory judgment brought by the city who, while not directly subject to the statutes the agency administered, was adversely affected by the agency's actions in interpreting and enforcing them. It held that the city could seek a declaration of the effect of a federal regulation—which had been incorporated into an agency rule—on the TNRCC's statutory authority to issue new permits allowing discharge of agricultural waste from confined animal feeding operations (CAFOs) into the Bosque River. *Id*. at 178. Although the city was not a party to the CAFO permitting process or directly subject to the TNRCC's statutory authority, its rights were adversely affected by the agency's refusal—under its interpretation of the regulation and its own rule—to adopt a plan determining the amount of pollutant that the river could receive and assimilate before issuing new permits for pollutants. *Id*. at 179. In this case Reconveyance, which is not subject to TDI's regulation, contends that its rights, status or legal relations have been adversely affected by TDI's refusal—based on its interpretation of the insurance code—to allow title companies to use Reconveyance's fee-based mortgage release services in Texas. We are not persuaded by TDI's argument that Reconveyance has not been injured or "affected" within the meaning of the UDJA merely because it is not directly regulated by TDI. *See* Ronald L. Beal, 2 *Texas Administrative Practice and Procedure* § 12.1, at 12-46 to 12-47 (2006) (observing that standing to assert UDJA claim against agencies seeking construction of regulatory statutes is not limited solely to persons directly regulated by them, that "[t]here appears to be no rational justification for such a reading of the UDJA," and that "[t]o restrict the UDJA in the agency context to only those persons directly subject to the provisions of the regulatory statute in question will severely restrict the efficacy of the UDJA cause of action of clarifying bonafide disputes as to the meaning of the relevant statutes").

26

We also reject TDI's assertions that Reconveyance's UDJA claim is unripe because its only actions were to provide what it terms an "informal advisory opinion" to title insurers and agents. TDI compares this case to *Model Search*, which involved a UDJA claim brought by an entity that attempted to challenge an informal oral opinion obtained from agency staff that it was a "talent agency" within the agency's regulatory authority. *See Texas Comm'n of Licensing & Regulation v. Model Search Am., Inc.,* 953 S.W.2d 289 (Tex. App.—Austin 1997, no writ). This Court held that these actions did not "affect" Model Search's rights, status, or other legal relations "with the immediacy and concreteness contemplated by the Uniform Declaratory Judgments Act." 953 S.W.2d at 292. It explained:

> The trial court had before it no final agency order; indeed the court had before it no order at all, but only MSA's allegation that the agency's general counsel and director of enforcement told MSA that according to their interpretation of the Act MSA was obliged to obtain a certificate of registration. So far as the pleadings and evidence indicate, no public officer or private person has attempted to enforce against MSA the civil or criminal consequences of operating a talent agency in the state without a certificate of registration.

*Id.*

Here, by contrast, there is jurisdictional evidence that TDI has actually initiated enforcement proceedings against title agents who attempt to charge fees for post-closing release services—and would continue to do so. More to the point, there are, again, unchallenged pleading allegations that TDI's actions are causing *Reconveyance* concrete injury by preventing it from doing business through title agents and insurers in Texas. TDI, again, does not dispute these allegations or Reconveyance's jurisdictional evidence.

These allegations and evidence further point to the hardship Reconveyance would incur from the deprivation of its requested relief. Reconveyance contends that TDI is acting without lawful

27

authority in prohibiting title insurers and agents from charging a fee for post-closing release services. TDI is threatening enforcement action against any title insurers or agents who might charge such fees, and has actually cited one agent for doing so. Because Reconveyance's services would be offered on a pass-through fee basis, it is doubtful that any title insurers or agents would have an incentive to seek adjudication of Reconveyance's statutory construction issue in a TDI enforcement proceeding. The title insurance act does not provide a means by which Reconveyance could seek its relief from TDI.[15] Unless and until Reconveyance can obtain the declarations it seeks, what it contends are TDI's unlawful actions will continue to prevent it from doing business through Texas title insurers and agents. Further, on this record, this controversy will be "actually determined" by the declarations.[16]

Finally, as discussed earlier, Reconveyance's UDJA claim turns on a question of statutory construction—a question of law that is fit for judicial resolution. *Compare City of Waco,* 83 S.W.3d at 175-77 (holding that UDJA claim that agency acted beyond statutory authority "presents a purely legal inquiry" that "will not benefit from the development of additional facts in connection with a specific permit application"), *with Esquire Deposition Servs.,* ___ S.W.3d at ___ (statutory authority issue required consideration of specific facts within agency expertise and not yet presented) *and Beacon Nat'l Ins. Co.,* 86 S.W.3d at 268 (distinguishing *City of Waco* and holding that UDJA claims there "require[d] determination of several factual matters which have not been sufficiently developed").

---

[15] The sole "remedy" provided in the Act is section 2703.203, which, again, requires the insurance commissioner to hold a biennial hearing concerning rulemaking and ratemaking concerning regulation of the business of title insurance. Tex. Ins. Code Ann. §§ 2703.203-.205.

[16] Alternatively, TDI's singular focus on the "closing the transaction" construction issue demonstrates that, at a minimum, resolution of this issue will serve a useful purpose toward terminating the controversy. *Beadle,* 907 S.W.2d at 468 ("A trial court has discretion to enter a declaratory judgment so long as it will serve a useful purpose or will terminate the controversy between the parties.").

We conclude that Reconveyance has alleged a justiciable controversy concerning the scope of TDI's statutory authority that is appropriate for relief under the UDJA. We are not, of course, holding that "every word . . . of an administrative agency" or its employees presents a justiciable controversy sufficient to support a UDJA action, much less that courts should issue unconstitutional advisory opinions. ___ S.W.3d at ___ (Patterson, J., dissenting). If there is a constitutional concern here, it arises from the dissent's "settled expectations in administrative law" that would yield an administrative state untethered from the express statutory delegations that create and define its limited powers. We similarly reject the dissent's notion that courts must condone extra-statutory agency actions that cause injury and harm and give rise to justiciable controversies whenever an agency might label or posture such actions as "informal." This Court has held that a range of agency actions, while not falling within the procedural parameters of rules or contested-case orders, nonetheless can give rise to justiciable controversies concerning the scope of agency authority. *E.g.*, *Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870, 874-75 (Tex. App.—Austin 2006, pet. denied) (UDJA claim that agency's issuance of advisories inconsistent with statutory requirements was outside agency's statutory authority); *see also Texas Lottery Comm'n v. Scientific Games Int'l, Inc.,* 99 S.W.3d 376 (Tex. App.—Austin 2003, pet. denied) (addressing UDJA and injunctive claims challenging commission's statutory authority to issue policy statement departing from competitive-bidding requirements). Such is the case here.[17]

---

[17] We similarly reject TDI's view that we should not permit Reconveyance's suit based on what they characterize as a mere "informal advisory opinion" because doing so would discourage agencies from giving informal opinions and that would be bad public policy. *Model Search Am., Inc.,* 953 S.W.2d at 292 ("[T]o permit suits . . . upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions than any possible gain."). First, we have rejected TDI's premise that its actions here are similar to the informal actions in *Model Search*. We further observe that the public policy benefits of categorically barring judicial scrutiny of allegedly unlawful agency actions that, while ostensibly "informal," nonetheless have significant impact on regulated entities and others are not beyond

We overrule TDI's second issue.

## CONCLUSION

Having overruled TDI's issues, we affirm the order of the district court overruling TDI's plea to the jurisdiction. We emphasize that "this is not a decision on the merits," *Texas Mun. Power Agency v. Public Util. Comm'n,* 100 S.W.3d 510, 513 (Tex. App.—Austin 2003, pet. denied), and we express no opinion on that subject.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
    Dissenting Opinion by Justice Patterson

Affirmed

Filed:   August 31, 2007

_____

question. *Cf.* Ron Beal, *A Miry Bog Part II: UDJA and APA Declaratory Judgment Actions and Agency Statements Made Outside a Contested Case Hearing Regarding the Meaning of the Law*, 59 Baylor L. Rev. 267, 284-85 (2007) (arguing for clearer judicial recognition of "interpretive rules" susceptible to challenge under section 2001.038 of the APA, urging that "all parties concerned could obtain a definite ruling by the judiciary as to the meaning of the relevant law. If the agency interpretation is upheld, the agency may proceed with enforcement knowing its actions fulfill the legislative intent, and all parties would be willing to accept the cost of compliance knowing the interpretation would be upheld by courts in any subsequent enforcement or contested case proceeding. Likewise, if the agency learns its interpretation is invalid, vast resources will be preserved by not enforcing the illegal interpretation and regulated parties will not have unnecessarily expended resources to comply with the illegal interpretation and application of the law.").